[¶ 1] This matter came before the Court upon the Board of Professional Responsibility's "Report and Recommendation for Order of Disbarment," filed herein March 21, 2019. The Court notes Respondent Traci E. Mears did not file any objection to the Report and Recommendation. See Rule 16, Wyoming Rules of Disciplinary Procedure. The Court, after a careful review of the Report and Recommendation and the file, finds that the Report and Recommendation should be approved, confirmed and adopted by the Court, and that Respondent Traci E. Mears should be disbarred. It is, therefore,
[¶ 2] ADJUDGED AND ORDERED that the Board of Professional Responsibility's "Report and Recommendation for Order of Disbarment," which is attached hereto and incorporated herein, shall be, and the same hereby is, approved, confirmed, and adopted by this Court; and it is further
[¶ 3] ADJUDGED AND ORDERED that, as a result of the conduct set forth in the Report and Recommendation for Order of Disbarment, Respondent Traci E. Mears shall be, and hereby is, disbarred, effective immediately; and it is further
[¶ 4] ORDERED that Respondent shall comply with the requirements of the Wyoming Rules of Disciplinary Procedure, particularly the requirements found in Rule 21 of those rules. That rule governs the duties of disbarred and suspended attorneys; and it is further
[¶ 5] ORDERED that, pursuant to Rule 25 of the Wyoming Rules of Disciplinary Procedure, Respondent shall reimburse the Wyoming State Bar the amount of $ 1,698.25, representing the costs incurred in handling this matter, as well as pay the administrative fee of $ 750.00. Respondent shall pay the total amount of $ 2,448.25 to the Wyoming State Bar on or before July 1, 2019. If Respondent fails to make payment in the time allotted, execution may issue on the award; and it is further
[¶ 6] ORDERED that the Clerk of this Court shall docket this Order of Disbarment, along with the incorporated Report and Recommendation for Order of Disbarment, as a matter coming regularly before this Court as a public record; and it is further
[¶ 7] ORDERED that, pursuant to Rule 9(b) of the Wyoming Rules of Disciplinary Procedure, this Order of Disbarment, along with the incorporated Report and Recommendation for Order of Disbarment, shall be published in the Wyoming Reporter and the Pacific Reporter; and it is further
[¶ 8] ORDERED that the Clerk of this Court cause a copy of this Order of Disbarment to be served upon Respondent Traci E. Mears.
[¶ 9] DATED this 1st day of May, 2019.
BY THE COURT:
/s/ MICHAEL K. DAVIS
Chief Justice
Attachment
*1078 BEFORE THE SUPREME COURT STATE OF WYOMING In the matter of TRACI E. MEARS, WSB # 6-4166, BPR No. 2017-111 Respondent.
REPORT AND RECOMMENDATION FOR ORDER OF DISBARMENT
THIS MATTER came before the Board of Professional Responsibility of the Wyoming State Bar (the "Board") on March 6, 2019, for a telephonic sanction hearing pursuant to Rule 15(b)(3)((C), W.R.Disc.P. All members of the Board were in attendance. The Wyoming State Bar was represented by Bar Counsel, Mark W. Gifford. Respondent's counsel, Donald F. Carey, appeared on behalf of Respondent. Respondent did not attend the hearing.
Procedural History
1. Formal disciplinary proceedings in this matter were initiated with the filing of a formal charge on July 30, 2018. On that date, a copy of the formal charge was sent to Respondent via certified mail at the address most recently provided to the Wyoming State Bar but was returned unclaimed. On September 7, 2018, personal service was obtained upon Respondent by a private process server. Said service was effective pursuant to Rule 13(b), W.R.Disc.P.
2. Respondent timely filed an answer to the formal charge on September 27, 2018. Of note, Respondent's answer stated in paragraph 3, "As to the allegations contained in Paragraphs 4, 5, 6, 7, 8, 9, 13, 14, 15, and 16 of the Formal Charge, Respondent denies such charges have been proved by clear and convincing evidence." Respondent's answer concluded, "WHEREFORE, Respondent hereby informs Bar Counsel and the Board of Professional Responsibility that she does not intend to appear and contest the allegations and charges contained *1079 in the Formal Charge." Paragraphs 13 through 16 of the formal charge alleged that Respondent made two fraudulent charges totaling $762.85 to the debit card of a deceased friend in December 2014 and fabricated an explanation for those charges. Paragraphs 4 through 9 of the formal charge alleged that in representing the personal representative of the deceased friend's estate, Respondent filed a meritless request for extraordinary attorney fees to the probate court, thereby delaying, by nearly year, distribution of the estate's assets to decedent's two sons.
3. A scheduling conference was held October 9, 2018, with Bar Counsel and Respondent's counsel in attendance. The Board chair instructed the parties to confer and agree on a scheduling order in the case. When those efforts were unsuccessful, a second scheduling conference was requested by Bar Counsel and held on December 27, 2018, with Bar Counsel and Respondent's counsel in attendance. An order setting dates and deadlines followed on December 28, 2018.
4. On December 14, 2018, Bar Counsel served a notice to take Respondent's deposition on January 21, 2019, in Casper, Wyoming, the place of Respondent's resident. On January 15, 2019, Respondent's counsel informed Bar Counsel that Respondent would not appear at the deposition.
5. On January 16, 2019, Bar Counsel filed a motion for sanctions with supporting exhibits. Respondent's counsel filed a response to the motion on January 29, 2019. Following a hearing on the motion held on February 6, 2019, with Bar Counsel and Respondent's counsel in attendance, the Board chair entered an order granting Bar Counsel's motion for sanctions, ruling:
1. Respondent shall be prohibited from offering testimony of any kind or nature in this proceeding, except as to aggravating and mitigating factors in the sanction phase. This prohibition includes submitting any testimony by affidavit in response to Bar Counsel's pending motion for summary judgment.
*1080 2. Judgement by default is hereby entered against Respondent as to the rules violations alleged in the Formal Charge.
6. On January 22, 2019, Bar Counsel filed a motion for summary judgment on the ground that there were no genuine issues of material fact with respect to the rules violations alleged in the formal charge. The motion was supported by Exhibits 1 through 17. Respondent's counsel did not file a response to the motion, which was heard by a panel of three members of the Board in accordance with Rule 15(a)(7), W.R.Disc.P., on February 12, 2019, with Bar Counsel and Respondent's counsel in attendance. On February 14, 2019, an order was entered granting Bar Counsel's motion for summary judgment with respect to the rules violations alleged in the formal charge.
7. The matter proceeded to a telephonic sanction hearing on March 6, 2019. On February 19, 2019, Bar Counsel filed a sanction hearing brief with supporting Exhibits A through G. Respondent's counsel did not file a similar brief.
8. All members of the Board were in attendance at the sanction hearing, which was attended by Bar Counsel and Respondent's counsel. Bar Counsel's Exhibits A through G were offered and received into evidence without objection from Respondent's counsel, as were Exhibits 1 through 17 to Bar Counsel's motion for summary judgment. The Complainant, Kyle Vinson, testified by telephone. Respondent did not appear.
Findings of Fact
9. Traci Mears is a private practitioner who is currently serving a nine-month suspension, commencing June 15, 2018.See Board of Prof. Resp. v. Mears, 2018 WY 58, 418 P.3d 829 (Wyo. 2018). A Wyoming native, Respondent went to college and law school in Seattle. She was admitted to the Washington State Bar in 2000, where she practiced for a few years, and *1081 was admitted in Wyoming in 2006, where she practiced (most recently as Garden Creek Law Offices in Casper and Jackson) until her current suspension.
10. Bar Counsel's investigation of the present matter was initiated upon receipt of a complaint against Respondent by Kyle Vinson. Mr. Vinson is the son of Valerie Green, a childhood friend of Respondent who died in Respondent's home in Jackson on November 11, 2014. Ms. Green left a will naming her brother, Brian Green, as Personal Representative and her sons, Kyle Andrew Vinson and Michael Aaron Pacheco, as beneficiaries. After Ms. Green's death, Respondent acted as the attorney for her estate in probate proceedings in the Ninth Judicial District Court.
Respondent's Fraudulent Use Of Valerie Green's Debit Card After Her Death (Violations of Rules 1.15, 8.4(b) and 8.4(c))
11. On December 10, 2014 - approximately one month after Valerie Green's death - two charges were made on Ms. Green's debit card at Jackson businesses. The first was to Spring Creek Animal Hospital, which provided veterinary services to Respondent's pets, in the amount of $424.66. The second was to Jackson Hole Hat Company in the amount of $386.81. On the same day, Respondent made a separate purchase at Jackson Hole Hat Company in the amount of $93.49 and charged it to her Garden Creek Law Office debit card.
12. In March 2015, Brian Green, the Personal Representative for his sister's estate, discovered that more than 700 miles had been put on his sister's vehicle while it was in Respondent's custody after his sister's death. He also discovered the two December 2014 charges to Ms. Green's debit card and asked Respondent for an explanation. Respondent told Mr. Green that the vehicle had been used by a foreign exchange student living with Respondent, and that the foreign exchange student also made the charges to Ms. Green's debit card. On March 3, 2015, Respondent sent Mr. Green the following email:
Hey Brian - *1082 I finally got ahold of the foreign exchange student that was staying at my house between December and January. I confronted him about the mileage on Valerie's car and he admitted to having driven the car more than he was supposed to and when I did not know. Apparently he was driving it to work at the Village and back every day, to and from his job out at Liquor Down South the days he worked there, and when he was taking care of some houses and dogs for owners who were out of town. Then it dawned on me to grill him about the Spring Creek [Animal Hospital] charges. I keep Valerie's file with me and in December it was often at home. He thought her wallet was my wallet and he thought he was taking my card to pay for charges he incurred at Spring Creek [Animal Hospital] on my account. He intended to pay me back but `forgot' before he left and since this never showed up on my checking account I did not know he had done this.
He denies the other charge (Jackson Hat Company??) but at this point I think it had to have been him and told him he will have to repay this too. I don't even know where that store is...do you? I was in Casper this week and specifically the days those charges were made...
I am sponsoring him to come back to the US but I told him that I was suspending his sponsorship (1) until and unless he repaid the charges; and (2) any penalties, fees, etc. are repaid if the bank will not reverse those. I told him he owns a minimum of $1000 and we won't know the full amount until we talk to the bank. He said he will be sending $500 in the next 2 weeks and another $500 in April. I figured the charges totaling $762.85 and the difference ($237.15) could apply to the mileage he put on the car. I am his ONLY chance at sponsorship to come back to the US... Needless to say - I am permanently revoking sponsorship but he will not know this until after he repays everything.
So we need to talk to the bank about all of this and see how they want to handle it and if they are willing to reverse the charges, etc.
Traci
Mr. Green responded to Respondent's email as follows:
Not sure how to respond - the bank is already looking into it - have you seen anything in mail from them yet? I thought you said you had destroyed the card. Her file should not have been where he could have access to it. were the charges for your dogs? why would he charge something to your account without your knowledge or have access to any credit cards? If he does pay back that should help but it has caused a lot of trouble. I don't know where the hat company is either without looking it up.
Id., OBC 148.
*1083 13. Respondent's response:
I have not seen anything from the bank yet. Will let you know as soon as I do. I suggest we go in together and let them know what we found out and see if they will agree to waive overdraft fees, etc. given the circumstances.
Her file was in my home, in my bedroom, except for times when I had things out on the kitchen table to work on it. I had no reason to believe he would have violated my trust and privacy and I have work at home all the time.
He had permission to charge things to my account at Spring Creek [Animal Hospital] but he was supposed to pay for what he charged. I keep an emergency credit card that he knows about in case there is an emergency when I am away. It is a US Bank card, too. Valerie also knew about it and actually used it once when the dryer stopped working and she had to call for it to be repaired.
I did destroy the cards but later in December. You and I checked her balances at the Bank of Jackson Hole ATM the day we opened the Memorial Fund account and we decided to pull cash from Valerie's account in an effort to get it out before the bank locked down the account and held her money. What we discussed that day was going to a US Bank ATM at some point later to avoid the bank fees and pulling out the remainder of cash in her accounts before we got the probate action filed. This is what you and I agreed was best to do. I held on to her card for that purpose but we never did that so I destroyed all of the cards in her wallet once we filed the probate.
14. On March 4, 2015, Respondent sent Mr. Green an email stating in relevant part:
The only thing that arrived today from US Bank was the most recent statement. It is attached. It shows a credit applied to Valerie's account - they must have refunded the overdraft fees and charges, etc.? Would you be willing to go to US Bank with me next week and talk to them about what I found out? I want that kid to repay and he thinks his sponsorship is on the line he is more likely to. I spoke to a friend of mine who is a police officer and another friend I went to school with who is with DCI - they said it is unlikely that anyone would pursue the kid criminally because he is out of the country now. Once I revoke sponsorship - unless he finds another US citizen willing to step in - he won't be coming back. Also because the amount is less than felony level they would likely not pursue it anyway.
15. On the same day, Mr. Green sent an email to Respondent stating in relevant part:
If the foreign exchange student does not pay - then frankly you need to make it right and actually I feel it should be paid by you anyway and then you can deal with getting reimbursed by the kid - the card was in your care - and shouldn't have been available for him to have access in any way. Sorry but I'm just looking out for the best interests of Kyle and Aaron.
*1084 16. Respondent replied as follows:
I understand and I am no less angry about it than you are. I will make it right regardless... but would like the best opportunity to have him held responsible. The card was not available to him - he went into my bedroom - a door I keep closed at all times when people are staying in my house. I could no more have anticipated that anyone would have violated my privacy and personal space or prevented this than any bank who has been hacked or anyone who has had their credit card stolen.
Perhaps my judgment in agreeing to allow him to stay with me was off but I have known this kid for 2 years and had no reason to be suspect of him.
Frankly that you would question that I would make it right is sad and indicative that you do not know what Valerie meant to me and that there is nothing I would not do for her and for her boys.
17. Records produced by Spring Creek Animal Hospital in response to a subpoena from Bar Counsel include an entry on Respondent's "Client Account History" dated March 9, 2015, indicating that the $424.66 payment made on December 10, 2014, "was mistakenly charged to wrong cc - rec'd dispute and there will be a chargeback to our acct - Traci will come in or call in payment." On March 13, 2015, Respondent charged the $424.66 payment on her credit card. According to records subpoenaed from Spring Creek Animal Hospital, the payment was for veterinary services provided to Respondent's pets.
18. On March 10, 2015, a few days before she made the payment to Spring Creek Animal Hospital, Respondent sent Mr. Green an email stating in relevant part:
US Bank has now received back from Spring Creek [Animal Hospital] the amount that was charged in December on Valerie's debit card. They charged it back yesterday so you should have or will be hearing from them to get those funds back so they can go into her estate account. Do you have any update on the Jackson Hat Company amount?
19. Mr. Green contacted Robert Wachter, proprietor of Jackson Hole Hat Company. On April 3, 2015, Mr. Wachter sent the following email to Mr. Green:
*1085 Brian, the number we have on record to call when the hat came in is 307-251-1070.1 I sent a Facebook message to Traci hoping she would come clean and below is the response I got back. None of this makes sense to me and all the evidence points to Traci, but I could be wrong. I just would like someone to clean it up so everyone can get on with their lives. If the charge is reversed, I will turn over all I have to the Jackson Police. Bob
Mr. Wachter, unfortunately I am not the person who purchased anything from your store and I am also challenging this and several other changes on my credit/debit cards. Sadly, I had international guests in my home last summer through February 5 whom I have only recently discovered were using my identity and credit cards without my knowledge or permission. I am an attorney here in town and in Casper and the day (in fact the entire week) the charges at your store were made I was in Casper. I had court appearances in Casper that week and I simply was not physically present to have made the charges.2 Additionally, I have never been in your store and am not even sure where you are located as I have never had occasion or need to purchase anything from your hat store. I do believe I know who is responsible for the purchases from your store although I now believe more than one person may have been involved. I will gladly cooperate with any investigation. Further, if you change your approach, I do have some influence with the people whom I believe are responsible and may be able to convince them to repay the charges that were taken back from your store by the credit card company. Please accept this as formal notice not to ever contact me again through Facebook regarding this matter. Your threats are neither appropriate, accurate nor warranted and this matter would be far more professionally handled in a venue other than social media. You may direct any further inquiry to PO Box 4919, Jackson, WY 83001.
20. Affidavits from Cynthia Engelstad, part owner of Jackson Hole Hat Company, and Kathryn Pederson, a store employee, submitted in support of Bar Counsel's motion for summary judgment, attested to the fact that it was Respondent who made two purchases at the store on December 10, 2014.
21. The three-member panel of the Board which heard Bar Counsel's motion for summary judgment found that the foregoing conduct, all of which was undisputed by Respondent, *1086 constitutes clear and convincing evidence that Respondent used her deceased friend's debit card to purchase goods and services, and that such conduct violates Rules 8.4(b) (criminal act reflecting adversely on lawyer's honesty, trustworthiness or fitness) and 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation), W.R.Prof.Cond. Unauthorized use of the debit card as well as the unauthorized use of Ms. Green's vehicle after her death constitute violations of Rule 1.15 (duty to safeguard client property). The hearing panel's findings are hereby adopted and affirmed by the full Board.
Respondent's Attempt to Collect an Unreasonable Fee in the Probate Proceeding (Violation of Rules 1.5, 3.1 and 8.4(d))
22. Rule 1.5 imposed upon Respondent the duty to have a clear understanding with the client regarding the fees that would be charged for her work on the Valerie Green probate.See Rule 1.5(b), W.R.Prof.Cond. Respondent told Mr. Green from the beginning that she would not charge a fee for her work on the case, owing to her friendship with the decedent, but later changed her mind. In a November 7, 2016, email to Mr. Green, Respondent wrote:
I am withdrawing my previous offer to waive fees which was made only out of respect for my lifelong friendship with Valerie and as a gesture of kindness towards Kyle and Aaron. Given the absolute lack of appreciation or consideration for the time, unreimbursed costs I did not include (cleaning fees, new mattress, etc. from Valerie passing at my home, the costs I incurred for her funeral, the efforts I made to secure hugely reduced lodging for all of the family for the funeral and beyond - which Mike and the boys took extreme advantage of staying many days beyond the funeral, etc.) I am no longer willing to extend that gift.
23. Rule 1.5(a), W.R.Prof.Cond., provides in relevant part, "A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses." On September 1, 2016, Respondent filed a Final Report, Accounting, and Petition for Distribution in the Green probate which indicated that the assets of the estate consisted of $20,657.48 in cash. Respondent sought attorneys' fees in the amount of $5,175.21 based not only *1087 on the value of the estate but also on $213,511.22 in life insurance benefits and retirement account proceeds paid to Ms. Green's sons as beneficiaries.
24. On September 16, 2016, Kyle Vinson filed an Objection to Final Report, Accounting, and Petition for Distribution based, in part, on Respondent's inclusion of non-estate assets in the calculation of attorney's fees. Exhibit 12, OBC 018. Mr. Vinson stated, "I would like Ms. Mears to explain to the Court the resolution of banking accounts in which the inadvertent use of Decedent's debit card by a foreign exchange student staying in Ms. Mears' house resulted in a $763.87 that was refunded by U.S. Bank." Mr. Vinson's objection pointed out other deficiencies in the handling of the probate.
25. On November 8, 2016, Respondent filed a response to Mr. Vinson's objection in which Respondent provided excruciating details regarding Ms. Green's death, the resulting mess in Respondent's residence and clean-up efforts that followed. Respondent argued that she was entitled to extraordinary fees and defended her change-of-heart with respect to the charging of a fee as follows:
While waiving Counsel's statutory fees were initially considered, had this decision been made, my fees would have been gifted back to the boys once the Estate was closed. Counsel considered this out of respect for the decedent, my lifelong best friend and for no other reason. This decision to make this fit was never made in final and any consideration thereof is no longer offered.
With respect to the unauthorized charges to Ms. Green's debit card, Respondent offered the following explanation:
As Mr. Vinson mentioned in his Objection, the resolution to the circumstances in which a foreign exchange student mistakenly took from my dresser the debit card belonging to Ms. Green (he thought it was Ms. Mears' debit card which he had permission to use) was that the bank refunded those charges and any fees associated with Ms. Green's account. Additionally, the exchange student repaid to the two businesses the charges that were refunded so those businesses could not be harmed by his mistake.
*1088 As mentioned above, it was actually Respondent who made things right with her veterinarian on the $424.66 charge after Mr. Green challenged the charge. There is no evidence that Jackson Hole Hat Company was ever repaid, and certainly no evidence that a "foreign exchange student" was involved in either transaction.
26. On February 6, 2017, Mr. Vinson filed a response to Respondent's November 8, 2016, submittal in which he argued in part that the activities for which Respondent sought to recover extraordinary fees were not legal services at all. Pointing to Respondent's lack of diligence in getting the estate closed, Mr. Vinson concluded, "Mrs. Mears did indeed take care of this matter in a less professional, more lethargic manner than expected of a licensed attorney."
27. Also, on February 6, 2017, Mr. Green filed a response to Respondent's November 8, 2016, submittal in which he detailed numerous irregularities in Respondent's handling of the estate, including the unauthorized use of his sister's car after her death. Mr. Green disclosed that the unauthorized use of his sister's vehicle and the unauthorized charges on her debit card prompted him to seek other counsel in April 2015, an effort he abandoned when he could not find an attorney to take on such a small estate.
28. On June 14, 2017, Judge Timothy C. Day issued an order on Mr. Vinson's objection. Exhibit 16. Judge Day awarded statutory attorney fees to Respondent based upon the $27,749.42 value of the estate. Noting that recovery of extraordinary expenses is "limited to legal services provided ancillary to the estate," Judge Day observed, "Ms. Mears seeks to recover for expenses including making funeral arrangements and travel arrangements for family after the decedent's death, cleaning the home where the decedent passed away (which was Ms. Mears's home) and disposing of personal property." Judge Day concluded, "The Court finds that such fees were incurred by performing personal services but were not fees incurred in the provision of legal services which are the type of fees recoverable through Wyo. Stat. § 2-7-804(b)."
*1089 29. On August 4, 2017, an Order Approving Final Report and Accounting and Decree of Distribution was entered. Exhibit 17. For a small probate opened in January 2015 (see Exhibit 10), the passage of more than 30 months before closure is inexcusable. Much of that delay - from the time of filing the Final Report in September 2016 until closure of the probate nearly a year later - was caused by Respondent's filing of a meritless claim for attorney's fees.
30. The three-member panel of the Board which heard Bar Counsel's motion for summary judgment found that the foregoing conduct, all of which was undisputed by Respondent, constitutes clear and convincing evidence of Respondent's violation of Rules 1.5 (attorney fees), 3.1 (meritorious claims and contentions) and 8.4(d) (conduct prejudicial to the administration of justice), W.R.Prof.Cond. The hearing panel's findings are hereby adopted and affirmed by the full Board.
31. The Board finds that in committing the foregoing misconduct, Respondent violated duties owed to the client, the public, and the legal system. The Board finds that Respondent acted both knowingly and intentionally, and that actual harm was inflicted upon Valerie Green's personal representatives and her heirs, her sons, as a result of Respondent's misconduct.
32. The following aggravating are present in this case:
a. Prior disciplinary offenses. Respondent is presently suspended pursuant to a nine-month order of suspension commencing June 15, 2018. The suspension was ordered for Respondent's multiple violations of Rule 8.1 (knowingly making a false statement of material fact in connection with a disciplinary matter) and Rule 8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation). See Board of Prof. Resp. v. Mears, 2018 WY 58, 418 P.3d 829 (Wyo. 2018).
b. Dishonest or selfish motive.
c. A pattern of misconduct. In significant respects, the misconduct committed by Respondent in this matter is disturbingly similar to the conduct that led to Respondent's nine-month suspension in the previous disciplinary case.
*1090 d. Multiple offenses. In this matter, there is clear and convincing evidence that Respondent violated six different rules and violated duties owed the client, the public and the legal system in misconduct committed over a several-year period.
e. Bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency. Through her counsel, Respondent made material misrepresentations to Bar Counsel in her response to Mr. Vinson's complaint and failed to appear for a duly-noticed deposition in this proceeding.
f. Submission of false evidence, false statements, or other deceptive practices during the disciplinary process. As indicated above, through her counsel, Respondent made material misrepresentations to Bar Counsel in her response to Mr. Vinson's complaint.
g. Refusal to acknowledge wrongful nature of conduct. Respondent has been steadfast in her denial that she made the fraudulent charges to her deceased friend's debit card.
h. Vulnerability of the victims. Both the personal representative and the two heirs were injured by Respondent's conduct. When the personal representative and the Complainant, Kyle Vinson, challenged the fraudulent debit card charges, Respondent fabricated an excuse and repeated that fabrication in her filings with the probate court.
i. Substantial experience in the practice of law. Respondent was admitted to practice in Washington in 2000 and in Wyoming in 2006.
j. Indifference to making restitution. The evidence shows that Respondent never repaid the Jackson Hole Hat Company for the $386.81 purchase she made on her deceased friend's debit card after the charge was reversed by the bank as a fraudulent charge. In effect, Respondent made the purchase under false pretenses and, ultimately, never paid for the merchandise.
k. Illegal conduct; i.e., making fraudulent charges on her deceased friend's debit card.
33. There are no mitigating factors present in this case.
34. The Board finds that the findings set forth above have been proved by clear and convincing evidence found in the exhibits to Bar Counsel's motion for summary judgment, the *1091 exhibits to Bar Counsel's motion for sanctions, and in the testimony of Complainant, Kyle Vinson.
35. In light of the findings set forth above, the Board finds that the appropriate sanction for Respondent's misconduct is disbarment.
36. In its deliberations, the Board considered and discussed the request of Respondent's counsel that any report issued in this matter include a recommendation that the Wyoming Supreme Court direct the Wyoming State Bar not to issue a press release regarding any order of discipline that may issue in this matter. The Board gave due consideration to the request and determined that it lacks the authority to make such a recommendation. However, the Board agrees that the issuance of such press releases in cases in which the Court issues an order of public discipline serves several important purposes, including providing notice to the public that the Wyoming State Bar can and does act to police its own and that lawyers who stray from their ethical obligations are held accountable for their actions.
Conclusions of Law
37. Rule 1.5(a), W.R.Prof.Cond., provides in relevant part, "A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses."
38. Rule 1.15(a), W.R.Prof.Cond., provides in relevant part, "A lawyer shall hold property of clients or third persons that is in the lawyer's possession in connection with the representation separate from the lawyer's own property."
39. Rule 3.1(a), W.R.Prof.Cond., provides in relevant part, "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous ***."
40. Rule 8.4, W.R.Prof.Cond., provides in relevant part:
*1092 Rule 8.4. Misconduct.
It is professional misconduct for a lawyer to:
(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; [or]
(d) engage in conduct that is prejudicial to the administration of justice ***.
41. Rule 15(b)(3)(D), W.R.Disc.,P., lists the factors to be considered in determining lawyer sanctions:
(D) In imposing a sanction after a finding of misconduct by the respondent, the BPR shall consider the following factors, as enumerated in the ABA Standards for Imposing Lawyer Sanctions, which standards shall be applied by the BPR in determining the appropriate sanction:
(i) Whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession;
(ii) Whether the lawyer acted intentionally, knowingly, or negligently;
(iii) The actual or potential injury caused by the lawyer's misconduct; and
(iv) The existence of any aggravating or mitigating factors.
42. The American Bar Association's Standards for Imposing Lawyer Sanctions (the "ABA Standards") state, "The purpose of lawyer discipline proceedings is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely properly to discharge their professional duties to clients, the public, the legal system, and the legal profession."
*1093 43. ABA Standard 3.0 lists the factors to be considered in imposing a sanction after a finding of lawyer misconduct, and essentially mirrors the language of Rule 15(b)(3)(D), W.R.Disc.Proc.:
(a) the duty violated;
(b) the lawyer's mental state;
(c) the potential or actual injury caused by the lawyer's misconduct; and
(d) the existence of aggravating or mitigating factors.
44. Standard 5.1 sets forth the sanction guidelines for lawyers who demonstrate a failure to maintain personal integrity and is applicable to situations in which lawyers have committed a violation of Rule 8.4(b) (criminal conduct) and Rule 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation):
5.1 Failure to Maintain Personal Integrity
Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, or in cases with conduct involving dishonesty, fraud, deceit, or misrepresentation:
5.11 Disbarment is generally appropriate when:
(a) a lawyer engages in serious criminal conduct, a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses; or
(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.
5.12 Suspension is generally appropriate when a lawyer knowingly engages in criminal conduct which does not contain the elements listed in Standard 5.11 and that seriously adversely reflects on the lawyer's fitness to practice.
*1094 5.13 Reprimand [i.e., public censure under Rule 9(a)(3), Wyo.R.Disc.Proc.] is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit or misrepresentation and that adversely reflects on the lawyer's fitness to practice law.
5.14 Admonition [i.e., private reprimand under Rule 9(a)(4), Wyo.R.Disc.Proc.] is generally appropriate when a lawyer engages in any other conduct that reflects adversely on the lawyer's fitness to practice law.
45. Respondent's violation of Rule 1.5 implicates ABA Standard 7.0:
7.0 Violations of Other Duties Owed as a Professional
Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving false or misleading communication about the lawyer or the lawyer's services, improper communication of fields of practice, improper solicitation of professional employment from a prospective client, unreasonable or improper fees, unauthorized practice of law, improper withdrawal from misrepresentation, or failure to report professional misconduct.
7.1 Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent [i.e., private reprimand under Rule 9(a)(4), Wyo.R.Disc.Proc.]to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public or the legal system.
7.2 Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system.
7.3 [Public censure] is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system.
7.4. [Private reprimand] is generally appropriate when a lawyer engages in an isolated instance of negligence that is a violation of a duty owed as a professional, and causes little or no actual or potential injury to a client, the public, or the legal system.
46. Respondent's violation of Rule 1.15 (safekeeping client property) falls within Standard 4.1:
4.1 Failure to Preserve the Client's Property *1095 Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases where the lawyer engages in fraud, deceit, or misrepresentation directed toward a client:
4.11 Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.
4.12. Suspension is general appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.
4.13 [Public censure] is generally appropriate when a lawyer is negligent in dealing with client property and causes injury or potential injury to a client.
4.14 [Private reprimand] is generally appropriate when a lawyer is negligent in dealing with client property and causes little or no actual or potential injury to a client.
47. Respondent's violation of Rule 3.1 (meritorious claims and contentions) falls under Standard 6.2:
6.2 Abuse of the Legal Process
Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving failure to expedite litigation or bring a meritorious claim, or failure to obey any obligation under the rules of the tribunal except for an open refusal based on an assertion that no valid obligation exists:
6.21 Disbarment is generally appropriate when a lawyer knowingly violates a court order or a rule with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a party or causes serious or potentially serious interference with a legal proceeding.
6.22 Suspension is generally appropriate when a lawyer knows that he or she is violating a court order or rule, and causes injury or potential injury to a client or a party, or causes interference or potential interference with a legal proceeding.
6.23 [Public censure] is generally appropriate when a lawyer negligently fails to comply with a court order or rule, and causes injury or potential injury to a client or other party, or causes interference or potential interference with a legal proceeding.
*1096 6.24 [Private reprimand] is generally appropriate when a lawyer engages in an isolated instance of negligence in complying with a court order or rule, and causes little or no actual or potential injury to a party, or causes little or no actual or potential interference with a legal proceeding.
48. The preamble to the ABA Standards includes the following discussion regarding mental state:
The mental states used in this model are defined as follows. The most culpable mental state is that of intent, when the lawyer acts with the conscious objective or purpose to accomplish a particular result. The next most culpable mental state is that of knowledge, when the lawyer acts with conscious awareness of the nature or attendant circumstances of his or her conduct both without the conscious objective or purpose to accomplish a particular result. The least culpable mental state is negligence, when a lawyer fails to be aware of a substantial risk that circumstances exist or that a result will follow, which failure is a deviation of a care that a reasonable lawyer would exercise in the situation.
49. Under the ABA Standards, "injury" is defined as "harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from `serious' injury to `little or no' injury; a reference to `injury' alone indicates any level of injury greater than `little or no' injury." The record is clear that Respondent's misconduct imposed actual injury upon parties, opposing counsel, the judicial process and the public.
50. ABA Standard 9.0, entitled "Aggravation and Mitigation," provides as follows:
9.1 Generally
After misconduct has been established, aggravating and mitigating circumstances may be considered in deciding what sanction to impose.
9.2 Aggravation
9.21 Definition. Aggravation or aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed.
9.22 Factors which may be considered in aggravation. Aggravating factors include:
(a) prior disciplinary offenses;
*1097 (b) dishonest or selfish motive;
(c) a pattern of misconduct;
(d) multiple offenses;
(e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;
(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
(g) refusal to acknowledge wrongful nature of conduct;
(h) vulnerability of the victim;
(i) substantial experience in the practice of law;
(j) indifference in making restitution; and
(k) illegal conduct, including that involving the use of controlled substances.
9.3 Mitigation
9.31 Definition. Mitigation or mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed.
9.32 Factors which may be considered in mitigation. Mitigating factors include
(a) absence of a prior disciplinary record;
(b) absence of a dishonest or selfish motive;
(c) personal or emotional problems;
(d) timely good faith effort to make restitution or to rectify consequences of misconduct;
(e) full and free disclosure of disciplinary board or cooperative attitude toward proceedings;
(f) inexperience in the practice of law;
(g) character or reputation;
(h) physical disability;
*1098 (i) mental disability or chemical dependency including alcoholism or drug abuse when:
(1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;
(2) the chemical dependency or mental disability caused the misconduct;
(3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and
(4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.
(j) delay in disciplinary proceedings;
(k) imposition of other penalties or sanctions;
(l) remorse; and
(m) remoteness of prior offenses.
9.4 Factors Which Are Neither Aggravating nor Mitigating.
The following factors should not be considered as either aggravating nor mitigating:
(a) forced or compelled restitution;
(b) agreeing to the client's demand for certain improper behavior or result;
*1099 (c) withdrawal of complaint against the lawyer;
(d) resignation prior to completion of disciplinary proceedings;
(e) complainant's recommendation as to sanction; and
(f) failure of injured client to complain.
51. With respect to costs of disciplinary proceedings, Rule 25, W.R.Disc.P., provides:
Rule 25. Expenses and Costs.
(a) The expenses of members of the BPR, the ROC, Bar Counsel, and Special Bar Counsel, costs of a Disciplinary Judge, and other expenses incurred in the implementation or administration of these rules, shall be paid with funds allocated for that purpose by the Wyoming State Bar. The Wyoming State Bar shall compensate and pay the expenses of Disciplinary Judges.
(b) In addition to any costs assessed by the BPR, the ROC or the Court, an administrative fee of seven hundred fifty dollars ($750.00) shall be imposed by the BPR in all cases where private discipline, diversion, or public discipline is ordered. The administrative fee shall be assessed on a per-complaint basis.
(c) Costs means actual expenses incurred by Bar Counsel, the ROC, the BPR, and the Wyoming State Bar in connection with a disciplinary proceeding, reinstatement proceeding or diversion program, including without limitation the cost of depositions used in a proceeding, hearing transcripts, copying costs, conference call and other telephone expenses, fees for service of process and subpoenas, witnesses fees, fees paid to expert witnesses, and costs associated with travel, meals and lodging for the ROC, the BPR, the BPR Clerk and the Office of Bar Counsel.
(d) When an attorney is privately disciplined, the BPR or the ROC may assess against the attorney the costs incurred in connection with the investigation and disciplinary proceeding, together with the administrative fee.
(e) When public discipline is recommended by the BPR, it shall certify to the Court the costs incurred in connection with the investigation and disciplinary proceeding, together with the administrative fee. The BPR may recommend to the Court the assessment of those costs and, if the Court imposes discipline, the Court may assess all or any part of the certified costs, together with the administrative fee, against respondent.
(f) In any case where costs and fees are assessed, they shall be paid to the Wyoming State Bar.
Recommendation
Based upon the foregoing findings and conclusions, the Board recommends that the Court issue an order of disbarment to Respondent; that Respondent be required to pay an administrative fee of $750.00 as provided in Rule 25(b), W.R.Disc.P.; and that Respondent be required *1100 to reimburse the Wyoming State Bar for certified costs of this proceeding as provided in Rule 25(e), W.R.Disc.P.
Dated this 11 th day of March, 2019.
Jeffrey A. Donnell, Chair Board of Professional Responsibility Wyoming State Bar